FILED
2026 Apr-09  PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Dana Jacks, as Administrator and Personal Representative of the Estate of John Christopher Jacks, deceased, | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| Jefferson County, Alabama; | ) | Jury Trial Demanded |
| | ) | |
| Sheriff Mark Pettway, in his individual and official capacities; | ) | |
| | ) | |
| NaphCare Operating, LLC, a limited liability company; and, | ) | |
| | ) | |
| Fictitious Defendants A through Z, the true legal names of whom with reasonable diligence are unknown, are those individuals, persons, firms, corporations, or other legal entities responsible for the deliberately indifferent manner in which they failed to provide adequate medical care to Decedent; all of whose true names are unknown but will be added by amendment when ascertained, | ) | |
| | ) | |
| **Defendants.** | ) | |

## INITIAL PETITION

COMES NOW the Plaintiff Dana Jacks, as Administrator and Personal Representative of the Estate of John Jacks, by and through their undersigned counsel, and asserts the following demands for relief against the Defendants, as follows:

## JURISDICTION AND VENUE

1. This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under federal law, including 28 U.S.C. § 2201, 42 U.S.C. §§ 1983 and 1988.

2. This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the allegations in this complaint occurred in this district.

## PARTIES

4. Dana Jacks, Plaintiff, is the sister of decedent John Christopher Jacks and duly appointed Administrator and Personal Representative of the Estate of Mr. Jacks.  Ms. Jacks is a resident of Chilton County, Alabama and over the age of 19.

5. Defendant Jefferson County is a political subdivision of the State of Alabama with its two county seats located in Birmingham and Bessemer, Alabama.  At all times relevant to this lawsuit, Jefferson County had a non-delegable duty to provide inmates confined in Jefferson County Jail with adequate medical care.

6. Defendant Mark Pettway is sued is his individual capacity and his official capacity as the Sheriff of Jefferson County, Alabama.  At all times relevant to this action, Sheriff Pettway acted under color of law.

7.    Defendant NaphCare Operating, LLC, a domestic limited liability company, is believed to be the successor company to NaphCare, Inc. and NaphCare U.S., Inc. (collectively, "NaphCare"). NaphCare is a private, for-profit business with which Jefferson County contracted in 2020 to provide medical care at Jefferson County Jail.  The principal business address for NaphCare is 2090 Columbiana Road, Suite 4000, Birmingham, Alabama 35216.  The registered agent for NaphCare is Corporation Service Company, Inc., located at 641 South Lawrence Street, Montgomery, Alabama 36104.

8.    Fictitious Defendants A-Z, the true legal names of whom with reasonable diligence are unknown, are those individuals, persons, firms, corporations or other legal entities who with deliberate indifference failed to provide adequate medical care to John Jacks in the acts and omissions described herein; all of whose true names are otherwise unknown but will be added by amendment when ascertained.

## JURISDICTIONAL PREREQUISITES

9.    As required by Code of Alabama, §§ 11-12-8 and 6-5-20, Plaintiff notified Jefferson County Commission of the Estate's claims on two occasions: December 11, 2025 and March 10, 2026. See, *Ex. A, Notice Letters to Jefferson County Commission*.

10.   On March 12, 2026, Jefferson County Commission notified Plaintiff that her claim was denied, stating "Jefferson County Commission have no responsibility or authority over the Jefferson County Sheriff, Sheriff Deputies or its employees…the Jefferson County Commission is not legally liable for civil damages resulting from the performance of their duties." *Ex. B, Response from Jefferson County Commission*, dated March 12, 2026.

11. The Eleventh Circuit disagrees – "'Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.'" *Smothers v. Childers,* 159 F.4th 922, 925 (11th Cir. 2025) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[T]o paraphrase the so-called Pottery Barn rule, a reasonable jury could find that the county adopted and knowingly doubled down on a policy that broke the Jail's healthcare, so now the county owns the Jail's healthcare." *Ibid* (citation omitted).

12. This lawsuit is timely and brought within the relevant statutes of limitations as applied to Plaintiff's causes of action. Pursuant to Code of Alabama, § 6-2-14, "The time between the death of a person and the grant of letters of testamentary or of administration, not exceeding six months, is not to be taken as any part of the time limited for the commencement of actions by or against his executors or administrators." Mr. Jacks died on November 2, 2023. Ms. Jacks was appointed Administrator of his estate on April 10, 2025. See, *Ex. C, Letters of Administration,* dated April 10, 2025. This lawsuit was filed on April 9, 2026.

## FACTUAL ALLEGATIONS

13. Decedent John Christopher Jacks ("Mr. Jacks") was incarcerated at Jefferson County Jail in April 2022 where he was awaiting transfer to the Alabama prison system.

14. As known to Jefferson County Jail medical personnel, Mr. Jacks had a history of heart problems, in addition to other serious medical conditions.

15. On October 16, 2023, Mr. Jacks appeared in court to enter a guilty plea using a walker.

16. On October 25, 2023 at 6:35PM, Mr. Jacks was found unresponsive in his jail cell.

17. Medical personnel at the jail, employed by NaphCare, with whom Jefferson County contracted in 2020 to provide medical care at the jail, treated Mr. Jacks and returned him to his cell. It is not clear at this time what treatment was performed or whether Mr. Jacks returned to consciousness prior to being returned to his cell.

18. Despite visible evidence of very serious head trauma and knowledge of Mr. Jacks' history of heart and other serious medical conditions, jail personnel waited almost nine hours to transport Mr. Jacks (1.5 miles) to UAB Hospital, arriving at 3:14AM on October 26th.

19. Mr. Jacks was treated in the ICU at UAB, though his condition worsened and he was pronounced dead at 12:16AM on November 2, 2023. It is not clear whether Mr. Jacks ever regained consciousness while at UAB.

20. In the eight days that Mr. Jacks was in hospital, none of his family members were informed of his condition or the fact that he was in the hospital.

21. Ms. Dana Jacks, Administrator of his Estate, was contacted by the Medical Examiner's Office on November 2, 2023 and informed of his death, never having been made aware that he had been injured. When she asked what happened, she was told that he "may have fallen out of bed."

22. Mr. Jacks' injuries were clearly inconsistent with those of someone who "may have fallen out of bed."

23. The Jefferson County Medical Examiner (hereafter, "ME") concluded that Mr. Jacks' cause of death was "complications of blunt force injury of head." *Ex. D, Report of Jefferson County Coroner Medical Examiner Office for Decedent John Christopher Jacks,* dated November 2, 2023, p.1.

24. The ME's Report noted several items as evidence of blunt force injury to Mr. Jacks' head:

   a. Multiple intraparenchymal hemorrhages: left frontal, right temporal, and left cerebellum;

   b. Diffuse subarachnoid hemorrhages of the cerebrum and cerebellum;

   c. Linear non-displaced fracture of the left aspect of the posterior fossa;

   d. Fracture of the anterior fossa;

   e. Diffuse subdural hemorrhages;

   f. And, areas of hypoxic-ischemic changes in neurons. *Ex. D*, p.1.

25. The ME's Report further noted the following evidence of injury due to blunt force trauma:

   a. "The right eye has an area of yellow-purple contusion/ecchymosis."

   b. "A linear non-displaced fracture is on the left posterior cranial fossa. A small fracture is also observed on the left anterior fossa."

   c. "The reflected scalp shows diffuse contusion…." *Ex. D*, p.3.

26. Sheriff's Office personnel and NaphCare personnel knowingly deprived Mr. Jacks of potentially life-saving care when they waited almost nine hours to transport him to the hospital.

**NAPHCARE HAS A LONG HISTORY OF VIOLATING INMATES' EIGHTH AMENDMENT RIGHTS BY PROVIDING INADEQUATE MEDICAL CARE**

27. NaphCare was under contract with Jefferson County to provide medical care at the jail at the time of Mr. Jacks' injuries and death.

28.   NaphCare's business model is based on profiting from the inadequate provision of medical care.

29.   Upon information and belief, NaphCare failed to adequately staff the jail with qualified and competent medical care providers.

30.   Upon information and belief, Jefferson County Sheriff's Office and Jefferson County were aware of NaphCare's inadequate staffing of qualified and competent medical care providers, yet continued to conduct business with NaphCare and even extended NaphCare's contract.

31.   NaphCare has a custom, practice, policy, and history of violating inmates' Eighth Amendment rights by providing neglectful, abusive, deliberately indifferent and substandard care, resulting in hundreds of lawsuits and investigations alleging wrongful death of inmates at NaphCare's hands:

   a.   A 2003 analysis determined that the mortality rate in Alabama prisons increased 43% in the first year that NaphCare provided medical services in Alabama prisons, from March 1, 2001 through February 28, 2002. Burton, Lonnie, *The Deadly Health Services of Naphcare in Alabama,* https://www.prisonlegalnews.org/news/2003/oct/15/the-deadly-health-services-of-naphcare-in-alabama/, accessed April 6, 2026.  The State of Alabama canceled its contract with NaphCare shortly thereafter.

   b.   In 2014, a mental health and addiction counselor, working for NaphCare, "was convicted of sexually molesting seven female inmates at a jail in Cincinnati." Chad Sokol, *NaphCare and Spokane County Jail both have had issues with medical care for inmates*, The Spokesman-Review, February 12, 2017,

https://www.spokesman.com/stories/2017/feb/12/naphcare-and-spokane-county-jail-both-have-had-iss/, accessed April 7, 2026.  Prosecutors said the counselor was fired from two mental health agencies prior to being hired by NaphCare – "once for keeping pornography on his work computer and once for fondling a patient." *Ibid.* He "also had a 1985 felony conviction for arson" in Georgia. *Ibid.*

c.  In July 2015, an inmate at the Richmond (Virginia) City Justice Center died of a seizure after NaphCare failed to provide him with anti-seizure medication. *Ibid.*

d.  In August 2016, a 48-year-old man died of sepsis at the Pierce County Jail in Tacoma, Washington after NaphCare "failed to provide him with medications for his Crohn's disease." *Ibid.*

e.  The Reno Gazette-Journal (Reno, NV) launched an investigation in April 2017 after the inmate mortality rate at Washoe County Jail, which contracted with NaphCare in 2015 for medical services, "jumped by nearly 600 percent." Anjeanette Damon, *Washoe County Jail audit finds serious health care deficiencies in wake of inmate deaths*, April 5, 2017, https://www.rgj.com/story/news/2017/04/05/washoe-county-jail-audit-finds-serious-health-care-deficiencies-wake-inmate-deaths/99545012/, accessed April 7, 2026.  The investigation concluded that switching to NaphCare in 2015 was the number one issue resulting in the increased mortality rate. Michelle Billman, *Reno Gazette-Journal Investigation Examines Spike in Jail Deaths*, KUNR Public Rado, June 6, 2017, https://www.kunr.org/public-health/2017-06-06/reno-gazette-journal-investigation-examines-spike-in-jail-deaths, accessed April 7, 2026.

f.  In May 2018, Washoe County, Nevada Sheriff candidate Heidi Howe spoke very publicly about the mis-management and increases in inmate deaths due to NaphCare's poor management. Heidi Howe, *Sheriff candidate Heidi Howe speaks out about jail deaths: Opinion,* May 14, 2018, https://www.rgj.com/story/opinion/voices/2018/05/14/sheriff-candidate-heidi-howe-speaks-out-jail-deaths-opinion/609775002/, accessed April 7, 2026. "In the first month (June 2015) it was clear the new NaphCare staffing plan, and the low compensation they provided their employees, was creating an unsafe environment in the Washoe County Jail." *Ibid.* "Then came the increase in deaths, many of which had a connection to medical and mental health care." *Ibid.* "Recently the county went back out to bid for a jail medical provider. I was dumbfounded to learn NaphCare won the bid." *Ibid.*

g.  A 2019 investigation in Skagit County, Washington estimated that NaphCare had been sued 272 times in federal court in the fifteen years prior alleging Eighth Amendment violations due to substandard health care. Tony Harrah, *Why has Skagit County contracted out health services at its new jail to a for-profit company with a terrible track record?,* https://skagitscoop.org/blog/why-has-skagit-county-contracted-out-health-services-at-its-new-jail-to-a-for-profit-company-with-a-terrible-track-record/, accessed April 7, 2026. "Ironically, even though Naphcare's corporate headquarters are in Alabama, that state, with arguably the worst prison system in the US, actually canceled Naphcare's contracts in 2003 after a series of state and federal lawsuits which alleged substandard – and worse – conditions in the facilities which NaphCare oversaw." *Ibid.* Quoting a 2018 ruling by a Virginia

court, "This settlement brings a monetary conclusion to a lawsuit involving some of the most appalling, inhumane conditions to which the undersigned judge has been privy to in over thirty years on the federal bench…," noting that the man had died, "ignored, 'among his own feces and bodily fluids.'" *Ibid*.

h.  An April 2019 report on deaths at the hands of NaphCare at Hampton Roads Regional Jail in Virginia (the same facility as the above-quoted case) relayed the story of a 24-year-old man (Jamycheal Mitchell) who died in 2015 while in custody for stealing about $5 of snacks from a 7-Eleven – a bottle of Mountain Dew, a Snickers bar, and a Zebra Cake. Aaron Morrison, *'They're Trying to Kill Us in Here,'* TheAppeal.org, April 16, 2019, https://theappeal.org/theyre-trying-to-kill-us-in-here/, accessed April 7, 2026.  Prosecutors for Portsmouth commonwealth spent two years interviewing employees of NaphCare, ultimately issuing a 166-page report that concluded Mr. Mitchell was subjected to abuse, substandard conditions and inadequate care from jail staff. *Ibid*.  Mitchell's family examined signatures (purported to be his) on NaphCare medical records and "believed that they were forgeries." *Ibid*.

i.  A 2020 study by Reuters concluded that NaphCare had the highest prisoner mortality rate of any healthcare provider in the country at 20.2 deaths per 10,000 inmates, or roughly 58% higher than the death rate for publicly managed medical services. Jason Szep, Ned Parker, Linda So, Peter Eisler, and Grant Smith, *U.S. jails are outsourcing medical care – and the death toll is rising*, https://www.reuters.com/investigates/special-report/usa-jails-privatization/, accessed April 6, 2026.

j.   A 2020 investigation by Boston, MA-based NPR station, WBUR, found that NaphCare was incentivized to minimize the number of hospital trips for inmates, having to pay the sheriff's department a $100 penalty for each trip in excess of a pre-determined cap. Beth Healy and Christine Willmsen, *Pain and Profits: Sheriffs Hand off Inmate Care to Private Health Companies,* March 24, 2020, https://www.wbur.org/news/2020/03/24/jail-health-companies-profit-sheriffs-watch, accessed April 6, 2026.  The investigation also determined that NaphCare paid $2.4 million to Suffolk County, MA Sheriff's department for inadequate staffing. *Ibid*.

k.   In 2021, the U.S. Department of Justice alleged that NaphCare had knowingly submitted false claims to the Federal Bureau of Prisons ("BOP") in connection with healthcare services provided at BOP facilities, forcing NaphCare to repay $694,593. *Prison Health Care Provider Naphcare Agrees to Settle False Claims Act Allegations*, June 25, 2021, https://www.justice.gov/archives/opa/pr/prison-health-care-provider-naphcare-agrees-settle-false-claims-act-allegations, accessed April 6, 2026.

l.   A 2023 investigation by The Guardian determined that, in additional to private liability, NaphCare had been penalized millions of dollars after deaths at facilities in Arizona, California, and Massachusetts and that inmates had died from a variety of preventable conditions including malnourishment, denial of anti-seizure mediations, and scabies.  *Medical provider to US jails failing to keep its patients alive, advocates say*, https://www.theguardian.com/us-news/article/2024/sep/05/naphcare-healthcare-jails, accessed April 6, 2026.

m. A 2025 article in The New Yorker relayed the starvation of Mary Casey while incarcerated at Pima County Jail in Tucson, Arizona. Sarah Stillman, *Starved in Jail,* The New Yorker, April 14, 2025, https://www.newyorker.com/magazine/2025/04/21/starved-in-jail, accessed April 7, 2026.  Ms. Casey had a history of mental health problems, requiring medication.  *Ibid*.  She had been in Pima County Jail twice in 2020, while under the management of a different health care provider, and received treatment for mental health issues almost immediately, leaving the jail having gained weight and in better health than when she had entered. *Ibid*.  Under NaphCare's care, Ms. Casey, despite an EMT's note on the day of her arrest that she was "requesting to be placed back on psych medications," did not see a mental health worker for almost a month. *Ibid*.  That health worker recommended that she see a psychiatric provider to get medications for her "long list of clear diagnoses: [PTSD], bipolar disorder, schizophrenia, and more." *Ibid*.  Despite this, she received no medication other than an anti-depressant and was ultimately sent to the hospital nearly four months after being arrested, weighing just ninety-one pounds (having lost more than fifty pounds), and died shortly thereafter of "protein-calorie malnutrition, an apparent result of her prolonged starvation in the county jail." *Ibid*.

n. Just slightly over a week before this lawsuit was filed, on March 27, 2026, the State of New York fined NaphCare $875,000 and barred it from providing medical services anywhere in the state. *Attorney General James Bars Correctional Health Care Provider from New York Following Deaths in Custody*, Attorney General, New York State, March 27, 2026, https://ag.ny.gov/press-release/2026/attorney-

general-james-bars-correctional-health-care-provider-new-york-following,

accessed April 7, 2026.  Attorney General Letitia James stated, "Our investigation found that NaphCare illegally practiced medicine in New York and failed to adequately protect individuals in custody who relied on their care. These failures put vulnerable individuals at serious risk and had devastating consequences." *Ibid*. "One incarcerated pregnant woman, who was given no prenatal care, repeatedly reported that her water had broken and that she was in labor, but was not evaluated by a medical provider for more than 30 hours and was not transported to a hospital until after she gave birth alone in her cell. Her premature newborn died hours later." *Ibid*.

32. NaphCare offers jails and prisons fixed price contracts that purport to limit annual medical care expenses by cities, counties and states.  Those agreements frequently place a maximum target on monthly and annual hospital transfers wherein NaphCare is charged penalties for referring patients to hospitals in excess of the monthly/annual target.

33. NaphCare's profit is derived from spending less on the actual medical care provided in a given year than the amount paid by the city/county/state pursuant to the fixed price contract.

34. In so contracting, NaphCare is incentivized to minimize the amount of money actually spent on medical care in jails, resulting in a standard of care that is notoriously substandard and in violation of the Eighth Amendment.

35. To the extent a county or sheriff's department is likely to share liability for violations of the Eighth Amendment, counties and sheriff departments have an incentive to institutionalize deliberate indifference.  As counties and sheriff departments save money

from fixed price contracts, they are further incentivized not to investigate the increased inmate deaths that are the inevitable result of contracts that incentivize inadequate healthcare.

36.    In this way, Jefferson County Sheriff's Office has institutionalized deliberate indifference – they have a custom of failing to investigate, report on, or file charges in relation to inmate deaths.

## SHERIFF PETTWAY AND THE JEFFERSON COUNTY SHERIFF'S OFFICE HAVE A CUSTOM OF DELIBERATE INDIFFERENCE REGARDING INMATE DEATHS - DESPITE A DRAMATIC INCREASE IN THE INMATE MORTALITY RATE

37.    Sheriff Pettway maintains a policy or practice of deliberate indifference to the serious medical needs of those incarcerated in its jail, and a policy or practice of using excessive force on inmates housed there.  Jefferson County Jail has long had one of the highest inmate mortality rates of any jail in Alabama.

38.    Chronically overcrowded, it is considered a "critically dangerous place" by law enforcement.    Sara    Snyder,    ABC3340    News,    September    1,    2015, https://abc3340.com/archive/jefferson-county-jail-overcrowding-puts-inmates-deputies-at-risk, accessed April 8, 2026.

39.    In a 2020 study conducted by Reuters determined Jefferson County Jail had the second highest mortality rate in Alabama, with 10 inmate deaths in the 12 years between 2008 and 2019, a rate of .83 deaths per year. Connor Sheets, Alabama's deadliest jail sees nine inmate deaths    since    2019,    AL.com,    December    9,    2020,

https://www.al.com/news/2020/12/alabamas-deadliest-jail-sees-nine-inmate-deaths-since-2019.html, accessed April 8, 2026.

40. The inmate mortality rate at Jefferson County Jail has (at least) quadrupled since 2020 – the year that Jefferson County first contracted with NaphCare – to 3.33 deaths per year.

41. At least 20 people died while in custody in Jefferson County Jail between 2020 and 2025:

    a.    Vijay Ramure Lipscomb, 33 years old, April 22, 2020 – "no evidence to suggest trauma or foul play."

    b.    Unknown, January 5, 2021 – inmate was "found hanging in his cell."

    c.    DeAngelo Maurice Barrett, 29 years old, March 9, 2022 – "the circumstances surrounding the death are being investigated."

    d.    Adam Jamal Isom, 28 years old, April 10, 2022 – "illegal drugs may have played a part."

    e.    Jeremy Dewayne Henderson, 29 years old, April 11, 2022 – "illegal drugs may have played a part."

    f.    Isaiah Rashad Lowe, 20 years old, March 8, 2023 – "found in his cell suffering from medical complications."

    g.    Joseph Ryan Byram, 39 years old, June 7, 2023 – "found to be experiencing apparent medical complications."

    h.    Unknown, 46 years old, August 19, 2023 – no suggestion of "foul play."

    i.    John Christohper Jacks, 48 years old, November 2, 2023 – found "in his private cell experiencing some type of medical event."

    j.    Brandon Wayne Parrish, 51 years old, January 29, 2024 – died from "what appeared to be a medical issue."

k.      Unknown, 55 years old, October 26, 2024 – "no signs of trauma or foul play."

l.      Clarence Cedric Fuller, 40 years old, February 4, 2025 – "no evidence of trauma or foul play."

m.      Shaquille James Staples, 31 years old, March 24, 2025 – "undisclosed medical event."

n.      Jimmy Aaron Boothe, 42 years old, April 21, 2025 – died nine days after "attempting to cause harm to himself." Boothe was taken off suicide watch after two weeks in the jail despite his sister and daughter continuing to call the jail to report him saying he wanted to die.

o.      Charlie James Dunn, 27 years old, April 30, 2025 – died four days after "attempting to harm himself."

p.      Andre Eugene Hope, 43 years old, July 6, 2025 – "no evidence of trauma or foul play."

q.      Michael Eugene Taylor, 46 years old, July 11, 2025 – "no trauma or foul play."

r.      Zingy Denise Gamble, 60 years old, August 27, 2025 - "no evidence of trauma or foul play."

s.      D'Koleman Juvan Harris, 24 years old, November 9, 2025 – "no evidence of trauma or foul play," despite his family's claim that he was strangled to death.

t.      Amanda Leigh Snow, 40 years old, December 6, 2025 – "no evidence of trauma or foul play."

42.     There is no indication that Sheriff Pettway has taken any action to attempt to curb the enormous rise in inmate deaths. If anything, the inmate mortality rate rapidly accelerated

in 2025 to (at least) nine deaths in one year, ***an increase of over one thousand percent*** from the mortality rate reported between 2008 and 2019.

43. Though the Sheriff's Office is quick to claim "no evidence of trauma or foul play," only in exceptionally rare instances do they release the results of an investigation – i.e., cases where drug toxicity is high or the decedent clearly committed suicide.

44. Despite the huge increase in inmate mortality, the public is almost never informed of the results of an investigation into an inmate's death.

45. Of the twenty deaths recited above, not one single investigation resulted in someone being charged with a crime.

46. There is likewise no indication that the Sheriff's Office investigated Mr. Jacks' death, despite Mr. Jacks' multiple skull fractures and the ME's conclusion that Mr. Jacks died from "blunt force injury to the head." *Ex. D*, at p.1.

47. The failure to investigate inmate deaths, hold anyone accountable for inmate deaths, or address the rapidly rising mortality rate are indicative of Sheriff Pettway's deliberate indifference to the risks inherent in inadequate medical care.

## JEFFERSON COUNTY ESTABLISHED AN OFFICIAL POLICY TO KNOWINGLY PROVIDE INADEQUATE MEDICAL CARE WHEN IT CONTRACTED, AND SUBSEQUENTLY RENEWED ITS AGREEMENT, WITH NAPHCARE

48. Pursuant to Code of Alabama, § 14-6-20, Jefferson County may "elect" physicians for the care of inmates and also may remove any such physicians "at the will of the county commission." *Ala. Code § 14-6-20*.

49.    Jefferson County has a duty to adequately fund medical care for inmates such that they are not deprived of necessary care in violation of the Eighth Amendment.

50.    Accounts of NaphCare's neglect are well-known and easily accessible via free Internet searches of newspaper and court records.  Despite this, Jefferson County contracted with NaphCare in May 2020. Erica Wright, *Jefferson County Jails to Get New Health Care Provider on June 1,* The Birmingham Times, May 28, 2020, https://www.birminghamtimes.com/2020/05/jefferson-county-jails-to-get-new-health-care-provider-on-june-1/, accessed April 7, 2026.  The agreement had an initial term of three years, with "two optional one-year renewals." *Ibid*.

51.    Jefferson County prioritized monetary savings over providing adequate and competent inmate healthcare when it contracted with NaphCare.

52.    Despite evidence that NaphCare was failing to honor the agreement by providing a sufficient number of qualified and competent medical providers at the jail, and an inmate mortality rate that rose dramatically after Jefferson County contracted with NaphCare, Jefferson County chose to continue, renew and extend its agreement with NaphCare.

53.    Jefferson County failed to take any action to remedy the rapidly worsening situation involving medical care at the jail.

54.    As with Walker County in *Smothers*, Jefferson County has established an "official policy to knowingly provide inadequate medical care to the people in the Jail." *Smothers*, at 933.

55.    In contracting and renewing its agreement with NaphCare, Jefferson County has acted with deliberate indifference to the known or obvious consequences of its policy of continuing to contract with NaphCare.

**FIRST CAUSE OF ACTION:**

**FAILURE TO PROVIDE ADEQUATE MEDICAL CARE IN VIOLATION OF 42 U.S.C. § 1983 – AGAINST SHERIFF PETTWAY, NAPHCARE, AND PERSONALLY NAMED AND FICTICIOUS DEFENDANTS**

56. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

57. At all times relevant to this action, Defendants acted under color of state law.

58. NaphCare was contractually obliged to provide adequate medical care at the Jefferson County Jail, a traditional state function.

59. The named and fictional Defendants employed by NaphCare performed traditional state functions in Jefferson County Jail.

60. Mr. Jacks suffered from a serious medical condition.

61. Defendants had subjective knowledge of Mr. Jacks' serious medical conditions through their own observations and discussions with staff while working at Jefferson County Jail.

62. When Defendants became aware of Mr. Jacks' multiple head injuries, Defendants consciously disregarded the risk of serious health complications due to the injuries and failed to take action to ensure that he received reasonable and necessary medical treatment in a timely manner.

63. Acting under color of law, Defendants, with deliberate indifference, failed to properly assess, document and refer Mr. Jacks to a hospital in a timely manner, depriving him of life-saving medical care.

64. As a direct and proximate result of Defendants' acts and omissions, Mr. Jacks endured a wanton infliction of pain, suffering, anguish and distress, culminating in his death on November 2, 2023.

65. Plaintiff claims damages against Defendants for said constitutional violations as prayed below.

**SECOND CAUSE OF ACTION:**

**WRONGFUL DEATH POLICY OR PRACTICE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS VIA 42 U.S.C. §1983 – AGAINST JEFFERSON COUNTY, NAPHCARE OPERATING, LLC, AND SHERIFF PETTWAY IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES**

66. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

67. At all times relevant to this action, Defendants acted under color of state law.

68. Mr. Jacks suffered from a serious medical condition which was ignored because of the customs and practices of Defendants Jefferson County, NaphCare and Sheriff Pettway.

69. With deliberate indifference to the medical needs of inmates, Defendants failed to implement adequate policies, procedures, customs, or practices for providing inmates such as Mr. Jacks with life-saving medical care.

70. With deliberate indifference to the medical needs of inmates, Defendants implemented policies, procedures, customs, and practices that created a dangerous condition of

confinement of withholding necessary medical treatment for non-medical purposes and to minimize expenses and maximize profits.

71. Defendants knew the customs and/or practices were widespread and were on notice that the above-described customs and/or policies of denying access to medical care to inmates were harmful to the health of inmates, such as Mr. Jacks, resulting in unnecessary pain, suffering and death.

72. Defendants had such knowledge from prisoner complaints, the rising inmate mortality rate, communications with the jail, from their own observations, common sense, news reports, prior legal matters, and in other various ways.

73. Media reports of NaphCare's inadequate and neglectful medical care reflect the existence of a pattern and practice over a substantial period of time of constitutional violations which were obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

74. Jefferson County's contracting with NaphCare, including the renewal and extension of that contract, is evidence that Jefferson County has endorsed, embraced and ratified NaphCare's constitutionally inadequate medical care.

75. Despite being aware of these long persistent constitutional violations, Defendants failed to take corrective action to ensure that inmates are provided access to necessary and adequate medical care.

76. Each of these Defendants acted with malice and/or deliberate indifference.

77. As a direct and proximate result of Defendants' deliberate indifference, Mr. Jacks was deprived of his constitutional right to be free from cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.

78.   Plaintiff claims damages against Defendants for said constitutional violations as prayed below.


**THIRD CAUSE OF ACTION:**

**ALABAMA STATE LAW – NEGLIGENCE AND/OR WANTONNESS AND/OR WILLFULNESS – AGAINST NAPHCARE, SHERIFF PETTWAY AND FICTICIOUS DEFENDANTS EMPLOYED BY NAPHCARE AND JEFFERSON COUNTY SHERIFF'S OFFICE**


79.   Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

80.   Plaintiff brings this claim pursuant to Alabama state law against Defendants NaphCare, Sheriff Pettway and the fictional individual Defendants employed by NaphCare and Jefferson County Sheriff's Office.

81.   The medical providers employed by NaphCare, including the fictional Defendants, knew or should have known of Mr. Jacks' serious medical conditions. After discovering his head injuries, they negligently, wantonly or willfully failed to transfer him to the hospital, where he could receive life-saving care, in a timely manner.

82.   Defendants NaphCare and Sheriff Pettway are liable for the acts and omissions of their agents and employees acting within the line and scope of their duties.

83.   The risk to Mr. Jacks' life from Defendants' and their agents' negligent, willful and/or wanton conduct was foreseeable.

84.   Defendants' and their agents' conduct was carried on with reckless and/or conscious disregard of the rights and safety of others.

85.     Defendants' negligent, willful, and/or wanton conduct was both the cause in fact and proximate cause of Mr. Jacks' death.

## FOURTH CAUSE OF ACTION:

## $1983 FAILURE TO FUND – AGAINST DEFENDANT JEFFERSON COUNTY, ALABAMA

86.     Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

87.     Pursuant to state law, Defendant Jefferson County has a duty to pay for medical care provided to inmates.

88.     To minimize costs, Jefferson County purposefully entered into or continued a contract with NaphCare because it was the least expensive provider of medical services to jail inmates.

89.     Jefferson County had subjective knowledge that the care being provided to inmates by NaphCare was substandard, that NaphCare failed to adequately staff the jail with medical care providers, that NaphCare was not fulfilling the terms of the contract, and was depriving inmates of necessary medical care for their serious medical needs.

90.     Jefferson County had knowledge of NaphCare's deficient and incompetent medical care from inmate complaints, prior legal actions, insurance audits, complaints, conversations with the Sheriff, news reports, a dramatically increased inmate mortality rate, and in other various ways, yet failed to take any action to rectify the matter.  Despite this knowledge, Jefferson County renewed and extended its agreement with NaphCare.

91.    Jefferson County was deliberately indifferent to inmates' need for medical care and acted in an objectively unreasonable manner by prioritizing expenses over care and failed to contract with another provider who would not deprive inmates of necessary medical care.

92.    As a matter of custom and practice, Jefferson County hired NaphCare to provide inmate medical care, and then continued and extended its agreement with NaphCare, despite knowing that NaphCare was failing to provide adequate care or services to inmates. Jefferson County habitually placed its desire to minimize inmate medical cost over its duty to provide funds necessary to provide constitutionally mandated medical care.

93.    As a direct and proximate result of Jefferson County's actions, Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments in violation of 42 U.S.C. §§ 1983 and 1988.

94.    Plaintiff claims damages against Jefferson County for said constitutional violations as prayed below.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief against all Defendants, separately and severally:

A.  Award her compensatory and punitive damages;

B.  Reasonable attorneys' fees, court costs and expenses; and,

C.  Such other relief as appears reasonable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: April 9, 2026

Respectfully submitted,

s/Nicholas H. Parks
Nicholas H. Parks
The Parks Law Firm, P.C.
Alabama Bar No: 7306M46B
Texas Bar No: 24058032
PO Box 200
Shannon, AL 35142
Phone: 214-991-2642
Fax: 214-441-6425
Email: nhparks@gmail.com