## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Dana Jacks, as Administrator and Personal Representative of the Estate of John Christopher Jacks, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:26-cv-00605-NAD |
| v. | ) ) ) | |
| Jefferson County, Alabama; | ) ) | Jury Trial Demanded |
| Sheriff Mark Pettway, in his individual and official capacities; | ) ) ) | |
| SymboCor, LLC, a limited liability company; | ) ) ) | |
| Fictitious Defendants A through Z, the true legal names of whom with reasonable diligence are unknown, are those individuals, persons, firms, corporations, or other legal entities responsible for the deliberately indifferent manner in which they failed to provide adequate medical care to Decedent; all of whose true names are unknown but will be added by amendment when ascertained, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff Dana Jacks, as Administrator and Personal Representative of the Estate of John Jacks, by and through their undersigned counsel, and asserts the following demands for relief against the Defendants, as follows:

**JURISDICTION AND VENUE**

1.  This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under federal law, including 28 U.S.C. § 2201, 42 U.S.C. §§ 1983 and 1988.

2.  This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the allegations in this complaint occurred in this district.

**PARTIES**

4.  Dana Jacks, Plaintiff, is the sister of decedent John Christopher Jacks and duly appointed Administrator and Personal Representative of the Estate of Mr. Jacks. Ms. Jacks is a resident of Chilton County, Alabama and over the age of 19.

5.  Defendant Jefferson County is a political subdivision of the State of Alabama with its two county seats located in Birmingham and Bessemer, Alabama. At all times relevant to this lawsuit, Jefferson County had a non-delegable duty to provide inmates confined in Jefferson County Jail with adequate medical care.

6.  Defendant Mark Pettway is sued is his individual capacity and his official capacity as the Sheriff of Jefferson County, Alabama. At all times relevant to this action, Sheriff Pettway acted under color of law.

7.  Defendant SymboCor, LLC ("SymboCor"), a domestic limited liability company, is a private, for-profit business with which Jefferson County contracted in 2023 to provide medical care at Jefferson County Jail.  The principal business address for SymboCor is 3765-A Governmental Blvd., Mobile, AL 36693.  The registered agent for SymboCor is Symbol Health Solutions, LLC, located at 3765-A Governmental Blvd., Mobile, AL 36693.

8.  Fictitious Defendants A-Z, the true legal names of whom with reasonable diligence are unknown, are those individuals, persons, firms, corporations or other legal entities who with deliberate indifference failed to provide adequate medical care to John Jacks in the acts and omissions described herein; all of whose true names are otherwise unknown but will be added by amendment when ascertained.

## PROCEDURAL HISTORY

9.  As required by Code of Alabama, §§ 11-12-8 and 6-5-20, Plaintiff notified Jefferson County Commission of the Estate's claims on two occasions: December 11, 2025 and March 10, 2026. See, *Ex. A, Notice Letters to Jefferson County Commission*.

10. On March 12, 2026, Jefferson County Commission notified Plaintiff that her claim was denied, stating "Jefferson County Commission have no responsibility or authority over the Jefferson County Sheriff, Sheriff Deputies or its employees…the Jefferson County Commission is not legally liable for civil damages resulting from the performance of their duties." *Ex. B, Response from Jefferson County Commission*, dated March 12, 2026.

11. The Eleventh Circuit disagrees – "'Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the

Eighth Amendment.'" *Smothers v. Childers,* 159 F.4th 922, 925 (11th Cir. 2025) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "[T]o paraphrase the so-called Pottery Barn rule, a reasonable jury could find that the county adopted and knowingly doubled down on a policy that broke the Jail's healthcare, so now the county owns the Jail's healthcare." *Ibid* (citation omitted).

12.    This lawsuit is timely and brought within the relevant statutes of limitations as applied to Plaintiff's causes of action.  Pursuant to Code of Alabama, § 6-2-14, "The time between the death of a person and the grant of letters of testamentary or of administration, not exceeding six months, is not to be taken as any part of the time limited for the commencement of actions by or against his executors or administrators."  Mr. Jacks died on November 2, 2023. Ms. Jacks was appointed Administrator of his estate on April 10, 2025. See, *Ex. C, Letters of Administration,* dated April 10, 2025.  This lawsuit was filed on April 9, 2026.

13.    After filing its Initial Petition, Plaintiff determined that NaphCare Operating, LLC was no longer providing health care services at Jefferson County Jail at the time of Mr. Jacks' death.  Plaintiff determined that SymboCor, LLC was the health care provider at that time, the correction of which is the basis of this First Amended Complaint.

## **FACTUAL ALLEGATIONS**

14.    Decedent John Christopher Jacks ("Mr. Jacks") was incarcerated at Jefferson County Jail in April 2022 where he was awaiting transfer to the Alabama prison system.

15.    As known to Jefferson County Jail and SymboCor personnel, Mr. Jacks had a history of heart problems, in addition to other serious medical conditions.

16.    On October 16, 2023, Mr. Jacks appeared in court to enter a guilty plea using a walker.

**DESPITE HAVING AT LEAST THREE SKULL FRACTURES AND A KNOWN HEART CONDITION, MR. JACKS WAS RETURNED TO HIS CELL FOR NINE HOURS BEFORE BEING TRANSPORTED TO UAB HOSPITAL**

17.    On October 25, 2023 at 6:35PM, Mr. Jacks was found unresponsive in his jail cell.

18.    Medical personnel at the jail, employed by SymboCor, with whom Jefferson County Sheriff's Office ("JCSO") contracted in 2023 to provide medical care at the jail, treated Mr. Jacks and returned him to his cell. It is not clear at this time what treatment was performed or whether Mr. Jacks returned to consciousness prior to being returned to his cell.

19.    Despite visible evidence of very serious head trauma and knowledge of Mr. Jacks' history of heart and other serious medical conditions, JCSO and SymboCor personnel waited almost nine hours to transport Mr. Jacks (1.5 miles) to UAB Hospital, arriving at 3:14AM on October 26th.

20.    Mr. Jacks was treated in the ICU at UAB, though his condition worsened and he was pronounced dead at 12:16AM on November 2, 2023. It is not clear at the time of this writing whether Mr. Jacks ever regained consciousness while at UAB.

21.    In the eight days that Mr. Jacks was in hospital, none of his family members were informed of his condition or the fact that he was in the hospital.

22.   Ms. Dana Jacks, Administrator of his Estate, was contacted by the Medical Examiner's Office on November 2, 2023 and informed of his death, never having been made aware that he had been injured.  When she asked what happened, she was told that he "may have fallen out of bed."

23.   Mr. Jacks' injuries were clearly inconsistent with those of someone who "may have fallen out of bed."

24.   The Jefferson County Medical Examiner (hereafter, "ME") concluded that Mr. Jacks' cause of death was "complications of blunt force injury of head." *Ex. D, Report of Jefferson County Coroner Medical Examiner Office for Decedent John Christopher Jacks,* dated November 2, 2023, p.1.

25.   The ME's Report noted several items as evidence of blunt force injury to Mr. Jacks' head:

   a.   Multiple intraparenchymal hemorrhages: left frontal, right temporal, and left cerebellum;

   b.   Diffuse subarachnoid hemorrhages of the cerebrum and cerebellum;

   c.   Linear non-displaced fracture of the left aspect of the posterior fossa;

   d.   Fracture of the anterior fossa;

   e.   Diffuse subdural hemorrhages;

   f.   And, areas of hypoxic-ischemic changes in neurons. *Ex. D*, p.1.

26.   The ME's Report further noted the following evidence of injury due to blunt force trauma:

   a.   "The right eye has an area of yellow-purple contusion/ecchymosis."

   b.   "A linear non-displaced fracture is on the left posterior cranial fossa. A small fracture is also observed on the left anterior fossa."

   c.   "The reflected scalp shows diffuse contusion…." *Ex. D*, p.3.

27.    JCSO and SymboCor personnel knowingly deprived Mr. Jacks of potentially life-saving care when they waited almost nine hours to transport him to the hospital.

## SYMBOCOR'S BUSINESS MODEL IS BASED ON SAVING COUNTIES MONEY ON INMATE HEALTHCARE BY MINIMIZING EMERGENCY ROOM VISITS

28.    Upon information and belief, SymboCor's business model is based on profiting from the inadequate provision of medical care to inmates.

29.    SymboCor's profit is derived from spending less on the actual medical care provided in a given year than the amount paid by the city/county/state pursuant to the fixed price contract.

30.    SymboCor has a profit incentive to minimize the amount of money actually spent on medical care in jails, resulting in a standard of care that is substandard and in violation of the Eighth Amendment.

31.    Based on documents obtained from the Alabama Secretary of State, SymboCor was formed on March 14, 2023. See, *Exhibit E, SymboCor Certificate of Formation*.

32.    Mr. Michael Molyneux appears to be both the Managing Member of SymboCor and the CEO of Symbol Health Solutions ("Symbol Health"), the Registered Agent for SymboCor and a company that claims, according to its website, to provide on-site health clinics to corporate clients. See, *Symbol Health Solutions - About*, https://symbolhealth.com/about/, accessed April 22, 2026.

33.    Among Symbol Health's claims are that it saved one employer over $1 million per year by providing on-site medical care. *Exhibit F, Symbol Health Solutions Case Study*, p.4.

34.    Symbol Health also claims that as many as two thirds of emergency room visits could be avoided with better primary care. *Id., at p.2*.

35.    Symbol Health advertises that it saves employers money by decreasing emergency room visits. *Id*., at p.4-5.

36.    SymboCor appears to promote a similar business model, catering to jails and inmates.

37.    SymboCor advertises that it "minimize[s] emergency transfers" by "[p]roviding efficient, cost-effective treatment through in-house suturing, 24/7 emergency physician access, onsite cardiac testing, and individualized care plans…." *http://www.SymboCor.com*, accessed April 22, 2026.

38.    SymboCor also advertises that "24/7 access to an emergency room physician effectively reduces send-outs…" and that "[t]ailored care plans reduce acute interventions, helping prevent urgent, high-cost treatments…" and that "[o]ur emergency team delivers expert, responsive care…life-saving interventions…ensuring timely, dependable care when it matters most." *https://symbocor.com/?page_id=906/*, accessed April 22, 2026.

## SYMBOCOR HAD NO ACTUAL EXPERIENCE MANAGING INMATE HEALTHCARE PRIOR TO ENTERING INTO ITS AGREEMENT WITH SHERIFF PETTWAY

39.    Unfortunately, SymboCor appears to have had no actual experience providing medical care to inmates prior to contracting with JCSO.  Based on the just four-month interlude between company formation and contracting with Sheriff Pettway, JCSO was one of the first, if not the very first, client of SymboCor.

40.     JCSO and Jefferson County were aware that SymboCor had zero experience providing inmate medical services prior to entering into the HSA.  Further, they continued to use SymboCor's services after it was apparent that SymboCor's inexperience was resulting in an increase in inmate deaths.

41.     On May 10, 2023, less than two months after company formation, SymboCor presented its proposal to provide medical care to JCSO inmates. *Ex. G, Health Services Agreement,* p.2. To induce JCSO's acceptance, SymboCor's presentation offered pricing that was almost $1 million, or 16%, less than what JCSCO was paying for medical services at the time. *Id.,* at p.23.

42.     Just four months later, on July 15, 2023, Sheriff Pettway, on behalf of JCSO and with approval of Jefferson County Commission, executed the Health Services Agreement with SymboCor. *Id.,* at p.22.  The HSA became effective on September 1, 2023, or about two months prior to Mr. Jacks' death at the hands of SymboCor and JCSO. *Id.*, at p.1.

43.     On September 16, 2025, Sheriff Pettway and SymboCor amended their HSA to award SymboCor an increase of over $1.2 million, or 22%, in additional pay for year three of the HSA. *Id.*, at p.24.  Notably, this represented a payment of $1,767,936, or 34%, above what SymboCor had originally proposed for year three of the HSA – *for provision of the exact same services. Id.,* at p.22,23.

44.     The basis for the award of an extra $1.2 million was due to SymboCor having "achieved substantial cost savings and reduced deputy manhours used for offsite medical transport and custody; and… given the aforesaid benefits received by Sheriff as a result of such services, Sheriff desire[d] to facilitate the continuation of such services…." *Id.*, at p.23.

45.    Upon information and belief, JCSO and Jefferson County were aware that SymboCor was providing inadequate staffing of qualified and competent medical care providers, yet continued to conduct business with SymboCor.

**SHERIFF PETTWAY AND THE JEFFERSON COUNTY SHERIFF'S OFFICE HAVE A CUSTOM OF DELIBERATE INDIFFERENCE REGARDING INMATE DEATHS - DESPITE A DRAMATIC INCREASE IN THE INMATE MORTALITY RATE**

46.    Sheriff Pettway maintains a policy or practice of deliberate indifference to the serious medical needs of those incarcerated in its jail, and a policy or practice of using excessive force on inmates housed there.  Jefferson County Jail has long had one of the highest inmate mortality rates of any jail in Alabama.

47.    Chronically overcrowded, it is considered a "critically dangerous place" by law enforcement.    Sara    Snyder,    ABC3340    News,    September    1,    2015, https://abc3340.com/archive/jefferson-county-jail-overcrowding-puts-inmates-deputies-at-risk, accessed April 8, 2026.

48.    In a 2020 study conducted by Reuters determined Jefferson County Jail had the second highest mortality rate in Alabama, with 10 inmate deaths in the 12 years between 2008 and 2019, a rate of .83 deaths per year. Connor Sheets, Alabama's deadliest jail sees nine inmate deaths    since    2019,    AL.com,    December    9,    2020, https://www.al.com/news/2020/12/alabamas-deadliest-jail-sees-nine-inmate-deaths-since-2019.html, accessed April 8, 2026.

49. Incredibly, SymboCor and JCSO fell just one death short of matching that record just last year. From JCSO's own press releases:

   a.   Clarence Cedric Fuller, 40 years old, February 4, 2025 – "no evidence of trauma or foul play."

   b.   Shaquille James Staples, 31 years old, March 24, 2025 – "undisclosed medical event."

   c.   Jimmy Aaron Boothe, 42 years old, April 21, 2025 – died nine days after "attempting to cause harm to himself."  Boothe was taken off suicide watch after two weeks in the jail despite his sister and daughter continuing to call the jail to report him saying he wanted to die.

   d.   Charlie James Dunn, 27 years old, April 30, 2025 – died four days after "attempting to harm himself."

   e.   Andre Eugene Hope, 43 years old, July 6, 2025 – "no evidence of trauma or foul play."

   f.   Michael Eugene Taylor, 46 years old, July 11, 2025 – "no trauma or foul play."

   g.   Zingy Denise Gamble, 60 years old, August 27, 2025 - "no evidence of trauma or foul play."

   h.   D'Koleman Juvan Harris, 24 years old, November 9, 2025 – "no evidence of trauma or foul play," despite his family's claim that he was strangled to death.

   i.   Amanda Leigh Snow, 40 years old, December 6, 2025 – "no evidence of trauma or foul play."

50. 2025 represented an ***increase of over one thousand percent*** in the inmate mortality rate at the hands of JCSO versus the 2008 to 2019 period.

51. Incredibly, 2025 appears to have been a record year for inmate deaths at Jefferson County Jail *before* JCSO awarded SymboCor an extra $1.2 million.

52. Not only is JCSO deliberately indifferent to inmate healthcare and mortality, they paid a bonus for SymboCor's incompetence.

53. Further JCSO does not investigate inmate deaths. Of roughly twenty Jefferson County Jail deaths reported between 2020 and 2025, not one single investigation appears to have resulted in someone being charged with a crime.

54. There is likewise no indication that the Sheriff's Office investigated Mr. Jacks' death, despite Mr. Jacks' multiple skull fractures and the ME's conclusion that Mr. Jacks died from "blunt force injury to the head." *Ex. D*, at p.1.

55. The failure to investigate inmate deaths, hold anyone accountable for inmate deaths, or address the rapidly rising mortality rate are indicative of Sheriff Pettway's deliberate indifference to the risks inherent in inadequate medical care.

## JEFFERSON COUNTY ESTABLISHED AN OFFICIAL POLICY TO KNOWINGLY PROVIDE INADEQUATE MEDICAL CARE WHEN IT CONTRACTED, AND SUBSEQUENTLY RENEWED ITS AGREEMENT, WITH SYMBOCOR

56. Pursuant to Code of Alabama, § 14-6-20, Jefferson County may "elect" physicians for the care of inmates and also may remove any such physicians "at the will of the county commission." *Ala. Code § 14-6-20*.

57. Jefferson County has a duty to adequately fund medical care for inmates such that they are not deprived of necessary care in violation of the Eighth Amendment.

58. The HSA acknowledges Jefferson County's role in approving and allocating funds for continuation of the Agreement – "[i]t is understood and agree that this Agreement will be subject to annual appropriations to the Sheriff by the Jefferson County Commission." *Ex. G*, at p.12.

59. Despite the rapidly rising inmate mortality rate, Jefferson County chose to permit JCSO to continue, renew and extend its agreement with SymboCor.

60. Between 2023 and 2026, while prioritizing savings from decreased emergency room visits, Jefferson County paid SymboCor $3,216,336 more than originally estimated by SymboCor in its proposal to Jefferson County and JCSO. *Id.*, at p.23,24.

61. Jefferson County even approved a bonus of over $1.2 million for SymboCor in 2025 due to the decrease in emergency room visits.

62. Jefferson County prioritized monetary savings through decreased emergency room visits over providing adequate and competent inmate healthcare when it permitted JCSO to contract with SymboCor.

63. Jefferson County was deliberately indifferent to Mr. Jacks' health when they permitted JCSO to contract with SymboCor, a company with no history of providing inmate medical care, and when they failed to intervene and remedy the situation once it was clear that SymboCor was providing inadequate medical services.

64. As with Walker County in *Smothers*, Jefferson County has established an "official policy to knowingly provide inadequate medical care to the people in the Jail." *Smothers*, at 933.

## FIRST CAUSE OF ACTION:

## FAILURE TO PROVIDE ADEQUATE MEDICAL CARE IN VIOLATION OF 42 U.S.C. § 1983 – AGAINST SHERIFF PETTWAY, SYMBOCOR, AND PERSONALLY NAMED AND FICTICIOUS DEFENDANTS

65. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

66. At all times relevant to this action, Defendants acted under color of state law.

67. SymboCor was contractually obliged to provide adequate medical care at the Jefferson County Jail, a traditional state function.

68. The named and fictional Defendants employed by SymboCor performed traditional state functions in Jefferson County Jail.

69. Mr. Jacks suffered from a serious medical condition.

70. Defendants had subjective knowledge of Mr. Jacks' serious medical conditions through their own observations and discussions with staff while working at Jefferson County Jail.

71. When Defendants became aware of Mr. Jacks' multiple head injuries, Defendants consciously disregarded the risk of serious health complications due to the injuries and failed to take action to ensure that he received reasonable and necessary medical treatment in a timely manner.

72. Acting under color of law, Defendants, with deliberate indifference, failed to properly assess, document and refer Mr. Jacks to a hospital in a timely manner, depriving him of life-saving medical care.

73. As a direct and proximate result of Defendants' acts and omissions, Mr. Jacks endured a wanton infliction of pain, suffering, anguish and distress, culminating in his death on November 2, 2023.

74. Plaintiff claims damages against Defendants for said constitutional violations as prayed below.

## SECOND CAUSE OF ACTION:

## WRONGFUL DEATH POLICY OR PRACTICE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS VIA 42 U.S.C. §1983 – AGAINST JEFFERSON COUNTY, SYMBOCOR, AND SHERIFF PETTWAY IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES

75. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

76. At all times relevant to this action, Defendants acted under color of state law.

77. Mr. Jacks suffered from a serious medical condition which was ignored because of the customs and practices of Defendants Jefferson County, SymboCor and Sheriff Pettway.

78. With deliberate indifference to the medical needs of inmates, Defendants failed to implement adequate policies, procedures, customs, or practices for providing inmates such as Mr. Jacks with life-saving medical care.

79. With deliberate indifference to the medical needs of inmates, Defendants implemented policies, procedures, customs, and practices that created a dangerous condition of

confinement of withholding necessary medical treatment for non-medical purposes and to minimize expenses and maximize profits.

80.    Defendants knew the customs and/or practices were widespread and were on notice that the above-described customs and/or policies of denying access to medical care to inmates were harmful to the health of inmates, such as Mr. Jacks, resulting in unnecessary pain, suffering and death.

81.    Defendants had such knowledge from prisoner complaints, the rising inmate mortality rate, communications with the jail, from their own observations, common sense, news reports, prior legal matters, and in other various ways.

82.    Defendants were aware that SymboCor had zero prior experience managing or providing inmate medical care.

83.    JCSO's contracting with SymboCor, including the continuation of that contract in the face of SymboCor's inadequate care, is evidence that JCSO and Jefferson County Commission have endorsed, embraced and ratified SymboCor's constitutionally inadequate medical care.

84.    Despite being aware of these persistent constitutional violations, Defendants failed to take corrective action to ensure that inmates were provided access to necessary and adequate medical care.

85.    Each of these Defendants acted with malice and/or deliberate indifference.

86.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Jacks was deprived of his constitutional right to be free from cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.

87.   Plaintiff claims damages against Defendants for said constitutional violations as prayed below.

## THIRD CAUSE OF ACTION:

## ALABAMA STATE LAW – NEGLIGENCE AND/OR WANTONNESS AND/OR WILLFULNESS – AGAINST SYMBOCOR, SHERIFF PETTWAY AND FICTICIOUS DEFENDANTS EMPLOYED BY SYMBOCOR AND JCSO

88.   Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

89.   Plaintiff brings this claim pursuant to Alabama state law against Defendants SymboCor, Sheriff Pettway and the fictional individual Defendants employed by SymboCor and Jefferson County Sheriff's Office.

90.   The medical providers employed by SymboCor, including the fictional Defendants, knew or should have known of Mr. Jacks' serious medical conditions. After discovering his head injuries, they negligently, wantonly or willfully failed to transfer him to the hospital, where he could receive life-saving care, in a timely manner.

91.   Defendants SymboCor and Sheriff Pettway are liable for the acts and omissions of their agents and employees acting within the line and scope of their duties.

92.   The risk to Mr. Jacks' life from Defendants' and their agents' negligent, willful and/or wanton conduct was foreseeable.

93.   Defendants' and their agents' conduct was carried on with reckless and/or conscious disregard of the rights and safety of others.

94.    Defendants' negligent, willful, and/or wanton conduct was both the cause in fact and proximate cause of Mr. Jacks' death.

## FOURTH CAUSE OF ACTION:

## $1983 FAILURE TO FUND – AGAINST DEFENDANT JEFFERSON COUNTY, ALABAMA

95.    Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

96.    Pursuant to state law, Defendant Jefferson County has a duty to pay for medical care provided to inmates.

97.    To minimize costs, Jefferson County purposefully entered into or continued a contract with SymboCor because SymboCor proposed savings of almost $1 million, or 16%, versus what Jefferson County spent on inmate medical care the prior year. *Ex. G*, at p.23.

98.    Jefferson County had knowledge that SymboCor had zero experience in managing or provide medical care to inmates. Jefferson County had knowledge that SymboCor's business model was based on minimizing emergency room visits, resulting in cost savings to Jefferson County.

99.    Jefferson County had knowledge that the care being provided to inmates by SymboCor was substandard, that SymboCor failed to adequately staff the jail with medical care providers, that SymboCor was not fulfilling the terms of the contract, and was depriving inmates of necessary medical care for their serious medical needs.

100.    Jefferson County had knowledge of SymboCor's deficient and incompetent medical care from inmate complaints, prior legal actions, insurance audits, complaints, conversations

with the Sheriff, news reports, a dramatically increased inmate mortality rate, and in other various ways, yet failed to take any action to rectify the matter.

101.    Jefferson County was deliberately indifferent to inmates' need for medical care and acted in an objectively unreasonable manner by prioritizing cost savings over care and failed to contract with another provider who would not deprive inmates of necessary medical care.

102.    As a matter of custom and practice, Jefferson County hired SymboCor to provide inmate medical care, and then continued its agreement with SymboCor, despite knowing that SymboCor was failing to provide adequate care or services to inmates. Jefferson County habitually placed its desire to minimize inmate medical cost, through reduced emergency room visits, over its duty to provide funds necessary to provide constitutionally mandated medical care.

103.    As a direct and proximate result of Jefferson County's actions, Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments in violation of 42 U.S.C. §§ 1983 and 1988.

104.    Plaintiff claims damages against Jefferson County for said constitutional violations as prayed below.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief

against all Defendants, separately and severally:

A.  Award her compensatory and punitive damages;

B.  Reasonable attorneys' fees, court costs and expenses; and,

C.  Such other relief as appears reasonable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on

all issues so triable.

Dated: April 24, 2026

Respectfully submitted,

s/Nicholas H. Parks
Nicholas H. Parks
The Parks Law Firm, P.C.
Alabama Bar No: 7306M46B
Texas Bar No: 24058032
PO Box 200
Shannon, AL 35142
Phone: 214-991-2642
Fax: 214-441-6425
Email: nhparks@gmail.com
